# EXHIBIT 2

ROBERT MARTINO  AUGUST 06, 2012
A AVENTURA CHIROPRACTIC vs. MED WASTE

---

**Page 1**

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA

A AVENTURA CHIROPRACTIC CENTER, INC.,
Plaintiff,
vs.                            CASE NO.
                               12-CV-21695
MED WASTE MANAGEMENT LLC and
JOHN DOES 1-10,
Defendants.
_____

DEPOSITION OF
ROBERT MARTINO
TAKEN ON BEHALF OF THE PLAINTIFF

August 6, 2012
12:55 p.m. - 1:50 p.m.

2900 University Drive
Second Floor
Coral Springs, Florida

Cindy M. Whiting, RPR, CSR

---

**Page 2**

APPEARANCES OF COUNSEL

On Behalf of the Plaintiff:

ANDERSON & WANCA
BY: RYAN M. KELLY, ESQUIRE
Suite 760
3701 Algonquin Road
Rolling Meadows, Illinois 60008
847.368.1500
847.368.1501 fax
rkelly@andersonwanca.com

---

**Page 3**

INDEX OF EXAMINATION

WITNESS:
ROBERT MARTINO:
                                        Page
DIRECT EXAMINATION
By Mr. Kelly                              4

---

TO INDEX EXHIBITS

Plaintiff's
Exhibit      Description              Page

1            Subpoena                   5
2            Med Waste Fax             37

(Original Exhibits 1 through 2 have not been attached to the original transcript.)

---

**Page 4**

DEPOSITION OF ROBERT MARTINO
August 6, 2012

ROBERT MARTINO, having been first duly sworn, was examined and testified as follows:
   DIRECT EXAMINATION
BY MR. KELLY:
   Q   Can you state your name, please.
   A   Robert Martino.
   Q   Mr. Martino, I know I've taken your deposition in one other case, but let's go over the ground rules one more time.  There is a court reporter here, she's taking down what we say, my questions and your answers. It's important for you to allow me to finish asking the question before you start giving an answer to it; and the reason is, the court reporter can only take down what one person says at one time.  Do you understand that?
   A   Yes.
   Q   If I ask a question that you don't understand, you didn't hear, or just didn't - just didn't comprehend in any way, let me know.  I'll be happy to rephrase or restate the question.  However, if you do give an answer to a question that I did ask, I'm going to assume that you understood the question; is that fair?

ROBERT MARTINO                                                          AUGUST 06, 2012
A AVENTURA CHIROPRACTIC vs. MED WASTE

### 5

1   A   Yes.
2   Q   If you need to take a break at any time, just
3   let me know, we can do that as well. Okay?
4   A   Right.
5       MR. KELLY: All right. Can we mark this as
6   Exhibit 1?
7       (Plaintiff's Exhibit 1 was marked for
8   identification.)
9   BY MR. KELLY:
10  Q   I'm going to show you what has been marked as
11  Exhibit 1, it is six pages long. Have you seen this
12  before?
13  A   Yes.
14  Q   Okay. The date on this subpoena states
15  August 7th at 10:00 a.m.; do you see that?
16  A   Yes.
17  Q   And you've agreed to come in for the
18  deposition today at 1:00 p.m., correct?
19  A   Yes.
20  Q   And you were served with a subpoena; is that
21  right?
22  A   Yes.
23  Q   All right. And did you review the rider?
24  A   Yes.
25  Q   And it consisted of paragraphs 1 through 15;

### 6

1   do you see that?
2   A   Yes.
3   Q   Are there any documents responsive to any --
4   A   I don't really have any documents, but I did
5   bring with me a flash drive --
6   Q   Okay. So --
7   A   -- with an agreement and also a fax list that
8   I found.
9   Q   All right. So let me get the full question
10  out.
11      So you brought - you bought a flash drive with
12  you; is that correct?
13  A   Yes.
14  Q   Is that for me to keep?
15  A   Yes. I thought I brought it. Hold on. I
16  could have swore I brought it. (Indicating).
17  Q   Okay. Just for record, Mr. Martinez handed me
18  a flash drive. Do you want me to take the information
19  off of here and then send this back to you?
20  A   It doesn't matter. You can have it, if you
21  want, or if you want to transfer it, that's fine.
22  Q   Okay. Now, on the flash drive you said there
23  was an agreement?
24  A   Initial agreement, yes, for the sale of a fax
25  list.

### 7

1   Q   And there is also a fax list on there?
2   A   There is also a fax list. There is also
3   credit card transactions going back six months from the
4   time that he stopped faxing and stopped billing.
5   Q   When you say he, who are you referring to?
6   A   Abraham.
7   Q   And is that his first name or last name?
8   A   That's his last name.
9   Q   And what is his first name?
10  A   Excuse me. Abraham is his first name.
11  Q   And what is his last name?
12  A   Prager or something. Prager or -- it's
13  probably on here somewhere. I didn't remember that the
14  first time, remember, what his last name was.
15  Q   Okay. You think Prager is spelled
16  P-R-A-G-E-R; is that right?
17  A   I think - I think so.
18  Q   Now, everything that is on the flash drive,
19  are those all the documents that are responsive to
20  paragraphs 1 through 15?
21  A   Yes, they are. Unless I do not have
22  possession of them.
23  Q   Okay. Now, the agreement that's on the flash
24  drive, is that an agreement between you and Abraham?
25  A   Abraham, yes.

### 8

1   Q   And with respect to your workings with
2   Abraham, do you work for a certain company?
3   A   Med Waste.
4   Q   Okay.
5   A   That's the name of his company.
6   Q   What's the name of your company?
7   A   Adverfax, Inc.
8   Q   And where does Adverfax operate out of?
9   A   10097 Cleary Boulevard, Plantation, Florida
10  33324.
11  Q   And are you the owner of Adverfax?
12  A   Yes.
13  Q   What does Adverfax do?
14  A   It sells fax lists and fax systems.
15  Q   Did you sell a fax system to Abraham?
16  A   I did not. He had his own.
17  Q   And it's your understanding that Abraham
18  Prager operates a company called Med Waste Management?
19  A   Yes.
20  Q   When is the first contact you had with
21  Mr. Prager?
22  A   It was back in, I think it was 11 of '09.
23  Q   So, November of 2009?
24  A   Yes.
25  Q   Do you have any employees at Adverfax?

ROBERT MARTINO  
A AVENTURA CHIROPRACTIC vs. MED WASTE  
AUGUST 06, 2012

**Page 9**

1  A  I do not.
2  Q  Okay. So, all the contact that Adverfax would
3  have had with Mr. Prager, it would have been with you;
4  is that correct?
5  A  That's correct, yes.
6  Q  And to your knowledge, how did Mr. Prager
7  first come into contact with Adverfax --
8  A  I don't know how he --
9  Q  Okay. Yeah, you're anticipating the question,
10 let me just get it out.
11 A  Okay.
12 Q  So, to your knowledge, how did Mr. Prager
13 first come into contact with Adverfax in November of --
14 A  I don't remember. It may have been Google.
15 Q  Okay. But he sought you out?
16 A  Yes.
17 Q  And do you have any emails between yourself
18 and Mr. Prager?
19 A  I do not have any emails between myself and
20 Abraham.
21 Q  In November of 2009, what did Mr. Prager
22 request of you?
23 A  He bought a medical list for New York, New
24 Jersey, and Florida.
25 Q  Okay.

**Page 10**

1  A  Medical fax list.
2  Q  And did he just buy one list?
3  A  Just one list.
4  Q  And is that the list that's on the flash
5  drive?
6  A  That's correct.
7  Q  And how is it that you know that the list that
8  you sold Mr. Prager -- was that back in 2009?
9  A  Yes.
10 Q  How do you know that that's the same list
11 that's on the flash drive?
12 A  Because I found a directory on my computer and
13 it had Abraham's name and the fax list that he
14 purchased.
15 Q  And to your knowledge --
16 A  In fact, he may not even have purchased that
17 exact list because I had only sold him 40,000 numbers.
18 There is like 60-some-thousand in that particular list
19 which he may have bought from somebody else at a later
20 date.
21 Q  What do you mean, somebody else?
22 A  He may have bought that from Lenny at
23 FaxVantage.
24 Q  Lenny's last name is Lenny Stein, correct?
25 A  Yes.

**Page 11**

1  Q  Okay. So, how many companies are on the flash
2  drive?
3  A  They're like 60 some thousand.
4  Q  And they include medical companies from New
5  York, New Jersey, and Florida; is that right?
6  A  That's correct.
7  Q  And you believe that you sold that list to
8  Abraham?
9  A  Well, I think what happened was he bought --
10 I'm pretty sure that he bought more numbers from Lenny
11 and I merged them with - with the list that I had sold
12 him and took the duplicates out, which made a master
13 list. And that's the master list.
14 Q  Okay. Now, if Mr. Prager purchased a list
15 from FaxVantage, would that list have gone to you?
16 A  Yes, he would have sent it to me so I could
17 take the duplicates out.
18 Q  Okay. And --
19 A  Abraham probably sent me whatever he bought
20 from Lenny, and then I merged them together.
21 Q  Okay. So, is it your understanding that the
22 list on the flash drive would have been company
23 information that Mr. Prager had in his possession in at
24 least November of 2009?
25 A  Yes.

**Page 12**

1  Q  Okay. Now --
2  A  And one more thing; that list has only got fax
3  numbers. It doesn't have company names, because that's
4  how we keep our data.
5  Q  Okay.
6  A  But they are medical numbers.
7  Q  All right. And was there an invoice that was
8  created for the selling of the list?
9  A  Yes, and that's included on the flash drive.
10 Q  And do you recall how much the invoice was?
11 A  I think it was $1,000.
12 Q  And did Mr. Prager pay for the fax list?
13 A  Yes.
14 Q  And did he pay Adverfax?
15 A  Yes.
16 Q  Now, you said that Mr. Prager didn't buy a fax
17 system from you; is that right?
18 A  No.
19 Q  Is that right?
20 A  Right.
21 Q  To your knowledge, how was Mr. Prager going to
22 use a fax system to send out faxes?
23 A  I think he was -- when he met me, he was
24 already sending faxes. So, he just needed numbers.
25 Q  Okay.

ROBERT MARTINO                                                              AUGUST 06, 2012
A AVENTURA CHIROPRACTIC vs. MED WASTE

### 13

1  A   But he had his own computer and his own
2  system.
3     Q   Any reason why or -- strike that.
4         Why was Lenny Stein involved in the selling of
5  a list to Mr. Prager?
6     A   I guess he caught up with Lenny on the web,
7  you know, for fax numbers.
8     Q   Then why -- Lenny has a good - good list,
9  correct?
10    A   (Witness nods head affirmatively).
11    Q   Is that a yes?
12    A   Yes.
13    Q   Okay. And why, then, use you to sell the list
14 to him?
15    A   Well, because Abraham met me before he met
16 Lenny.
17    Q   Okay. Did you recommend Lenny to him?
18    A   I - I don't remember if I did and -- I could
19 have, but I'm not sure if I did or not.
20    Q   All right. Other than selling Mr. Prager the
21 list, did you sell him anything else?
22    A   I did not.
23    Q   All right. So, the agreement that's on the
24 flash drive, that's an agreement between Adverfax and
25 Mr. Prager; is that right?

### 14

1  A   Yes.
2     Q   And what does the agreement state?
3     A   It's basically for the sale of fax number -
4  medical fax numbers for New Jersey, New York and
5  Florida.
6     Q   Okay. And then there is a credit card
7  transaction document on the flash drive?
8     A   There is a history of the transactions, his
9  monthly payments towards the end of 2011.
10    Q   Why was he making monthly payments?
11    A   Well, for -- when he started, I wasn't
12 charging anybody anything for the monthly service fees.
13 And then once I started charging, I pretty much charged
14 a list fee. And he was paying me like $100 a month for
15 access to the lists.
16    Q   Okay. So, you sold the one --
17    A   And if he needed service.
18    Q   All right. So you sold him one list back in
19 November of 2009 for $1,000; is that right?
20    A   Right.
21    Q   And did he pay a lump sum of $1,000?
22    A   He did.
23    Q   Okay. And how did that transaction take
24 place?
25    A   Credit card.

### 15

1  Q   Okay. And did he later want further
2  information regarding future lists?
3     A   He never really asked me, because he had
4  Lenny's list, and he never asked me for any other - any
5  other kind of lists.
6     Q   Why, then, charge him an additional $100 a
7  month, if he already had the list?
8     A   If he needed service that was, you know, like
9  kind of a service fee.
10    Q   Okay. So did you ever work on Mr. Prager's
11 fax system?
12    A   Yes.
13    Q   Okay. And that's what Adverfax does; is that
14 right?
15    A   Uh-huh.
16    Q   Is that a yes?
17    A   Yes.
18    Q   Okay. And would you remotely access his faxes
19 to him?
20    A   Yes.
21    Q   And can you tell me a little bit about -- or
22 strike that.
23        When did you first reach an agreement with
24 Mr. Prager that your company would assist him in
25 maintaining the fax system?

### 16

1  A   I can't really tell you that, because the
2  credit card statements that I can get from my reports
3  only go back six months.
4     Q   Okay.
5     A   But it wasn't - it wasn't that long.
6     Q   So, would it have been months after selling
7  the list in November?
8     A   Years. It was years after, that I started
9  charging him. I wouldn't -- I don't remember when it
10 was.
11    Q   All right. So maybe sometime in 2010 or 2011?
12    A   Right.
13    Q   Okay.
14    A   In fact, I think I only seen like four
15 payments for him at $100 a month and everything else was
16 declined.
17    Q   Okay. Was the system in place for you to
18 automatically take out $100 a month from his credit
19 card?
20    A   It's automatically billed through the credit
21 card.
22    Q   And you believe that there were at least four
23 transactions?
24    A   Yeah, I think I seen 450 on the report. There
25 could have been more. I just can only go back so far.

ROBERT MARTINO                                             AUGUST 06, 2012
A AVENTURA CHIROPRACTIC vs. MED WASTE

**Page 17**

1   Q   And how many times did you actually work on
2   Mr. Prager's fax system?
3   A   I don't know, 10, 15 times maybe.
4   Q   Can you tell me a little bit about
5   Mr. Prager's fax system?
6   A   I don't know, because he's got his own
7   computer and stuff. And what do you want to know about
8   it?
9   Q   Well, okay, let's take an educational session
10  here on how somebody would send faxes using their
11  computer, okay? So, generally, you would need a
12  computer; is that right?
13  A   Uh-huh.
14  Q   Is that a yes?
15  A   Yes.
16  Q   Okay. And you would also need some type of
17  fax software program, correct?
18  A   Right.
19  Q   Okay. Do you know what fax software program
20  he was using?
21  A   He was using ActiveFax.
22  Q   Okay. ActiveFax?
23  A   ActiveFax. ActFax.
24  Q   Okay.
25  A   A-C-T-I-V-E fax, ActiveFax.

**Page 18**

1   Q   Okay.
2   A   I think their website says ActFax.
3   Q   And who's the designer of that system?
4   A   ActiveFax.
5   Q   And is that the system that you use when you
6   would install a fax system on others?
7   A   Yes.
8   Q   And --
9   A   Software.
10  Q   And do you have an opinion as to that type of
11  software; is it reliable, accurate?
12  A   Yes.
13  Q   Is it well respected in the faxing community?
14  A   I wouldn't know.
15  Q   Okay.
16  A   They have been around for a long time.
17  Q   All right. And ActiveFax, that's software
18  that can be installed or downloaded on your computer; is
19  that right?
20  A   Yes.
21  Q   And you're familiar with the program; is that
22  right?
23  A   Yes.
24  Q   And that's because you also install it on
25  other people's computers?

**Page 19**

1   A   Yes.
2   Q   So, if Mr. Prager had a problem with sending
3   out faxes, your job would be to go into his system and
4   fix the problem, correct?
5   A   That's correct.
6   Q   And can you tell me what kind of experience
7   you have with faxing systems?
8   A   I have a lot of experience with fax systems.
9   Q   Okay. You've been doing it a long time?
10  A   Yes.
11  Q   More than ten years?
12  A   More than ten years.
13  Q   And that's your business, correct?
14  A   Yes.
15  Q   Now, you would, in order to troubleshoot or --
16  strike that.
17      The 10 to 15 times that you went on to his
18  system, can you explain what types of things you would
19  do?
20  A   Well, sometimes he would need help scheduling
21  the faxes.
22  Q   Okay.
23  A   Because he didn't fax all the time, maybe
24  every couple of months or something, so it wasn't like
25  he did it every day.

**Page 20**

1   Q   Okay. Why would he need help from you to
2   schedule a fax? Would he - wouldn't he be able to do it
3   himself?
4   A   Sometimes he was busy, you know, sometimes --
5   I don't know. He would call me.
6   Q   All right. Would he be able to send out the
7   faxes on his own or would he --
8   A   If he wanted to, he could, sure.
9   Q   Typically, would he send out the faxes on his
10  own, or would you assist him in doing that?
11  A   Well, most of the time what he would do is
12  resend them, and he did that whenever he wanted to.
13  Q   Resend them, meaning?
14  A   Just hit control A and hit resend.
15  Q   Now, in order to use ActiveFax, you would need
16  a fax list, correct?
17  A   Yes.
18  Q   And can you explain to me how you would take
19  the fax list and use it in the ActiveFax software
20  program?
21  A   Well, you would have to, you know, basically
22  import the numbers first.
23  Q   Okay. And then you would have to import an
24  image; is that right?
25  A   You don't import an image. You just bring up

ROBERT MARTINO                                                        AUGUST 06, 2012
A AVENTURA CHIROPRACTIC vs. MED WASTE

---

**21**

1  an image and go to file and print, and print to
2  ActiveFax.
3    Q   And then the image would be in ActiveFax,
4  correct?
5    A   I'm not sure if it would be in ActiveFax, but
6  it's just used as a -- it prints to ActiveFax.
7    Q   Now, then the user of the fax software program
8  would then be able to send the image to the thousands of
9  fax numbers on the list, correct?
10   A   Yes.
11   Q   And what command would enable you to do that?
12   A   Click send.
13   Q   And you would typically need a telephone line;
14 is that right?
15   A   Yes.
16   Q   Do you have an understanding of what telephone
17 carrier Mr. Prager was using?
18   A   I do not.
19   Q   Do you know how many times Mr. Prager sent out
20 faxes?
21   A   I do not.
22   Q   Do you have any information as to the quantity
23 of faxes he sent out?
24   A   Just what is on that list, probably, is all I
25 am aware of.

**22**

1    Q   All right.
2    A   If he has other numbers, I'm not sure.
3    Q   All right. You believe that Mr. Prager sent
4  at least one advertisement to the list of fax numbers on
5  the flash drive?
6    A   Yes.
7    Q   And you believe that he would have also sent
8  more than one --
9    A   Yes.
10   Q   -- over a given time period, correct?
11   A   Yes.
12   Q   Do you still have access to Mr. Prager's fax
13 system?
14   A   I do not.
15   Q   When was the last time you had access to it?
16   A   It would have been back in November or
17 December of 2011.
18   Q   Okay. And we're in July of 2012, correct?
19   A   Right.
20   Q   Why did you -- why do you no longer have
21 access to his fax system?
22   A   Because he stopped faxing and I haven't been
23 in the computer since.
24   Q   And is the reason why he stopped faxing is
25 because he was served with a lawsuit?

**23**

1    A   I don't know.
2    Q   Okay. When you were accessing Mr. Prager's
3  fax system, would you ever have the ability to determine
4  who the faxes were sent to?
5    A   Well, like I said, the numbers that we use are
6  just numbers, they don't have company names. So, it
7  would be hard to tell.
8    Q   Well, does ActiveFax print out a broadcast
9  summary or create a fax log?
10   A   It actually creates a sent log, okay, of which
11 numbers were completed.
12   Q   Okay.
13   A   But I don't know if he would print that.
14   Q   Okay. If you had access to Mr. Prager's fax
15 system, like you did back in 2010, 2011, would you be
16 able to retrieve the sent logs?
17   A   I would if I didn't delete them. In most
18 cases, other than his, I delete the logs before the next
19 send; but he always used the same numbers so those logs
20 would have still been in there.
21   Q   Okay. And why do you delete the sent logs?
22   A   Because it's a lot quicker. If you were to
23 sit there and wait for, you know, 30,000 faxes to delete
24 out of the program, it would take you an hour and a
25 half. I have a way where I can just go into the

**24**

1  directory and delete a file, the data log file and it
2  just wipes it out in two seconds.
3    Q   Okay. And you would normally do that for
4  Mr. Prager?
5    A   No. In his case he used the same numbers over
6  and over and he would resend whenever he wanted to.
7    Q   Okay.
8    A   So those numbers would still be in his
9  computer.
10   Q   And when you say his computer, do you know if
11 he was using a laptop, a desktop?
12   A   It was - it was -- you know what, I'm not
13 sure. It could - he only had two lines, so it could
14 have been a laptop, it could have been a desktop.
15   Q   And how do you know he only had two lines?
16   A   Because that's how many com ports he had.
17   Q   And what's a com port?
18   A   In ActiveFax, you'll see how many lines are
19 available, and there was two.
20   Q   And do you know the telephone carrier for
21 either line?
22   A   I do not.
23   Q   Did you ever install any of the lines on
24 Mr. Prager's system?
25   A   I did not.

ROBERT MARTINO                                                                AUGUST 06, 2012
A AVENTURA CHIROPRACTIC vs. MED WASTE

### 25

1  Q   Two lines is relatively small for a job of
2  30,000, correct?
3  A   Right. It would take about 15 days to send
4  them out.
5  Q   Generally, a one-page fax, it takes about a
6  minute to send a one-page fax?
7  A   Forty-five seconds to a minute, depending on
8  what's on the fax.
9  Q   Now, does Mr. Prager -- or back in November or
10 December of 2011, did Mr. Prager give you a telephone
11 call to say that he was stopped - he was not faxing?
12 A   No. I called him.
13 Q   Okay. What was the reason why you called him?
14 A   Because in our last deposition he came up on -
15 like a red flag, and I told him that you better stop
16 faxing.
17 Q   Okay. This case was actually filed in 2012.
18 So you believe that he stopped faxing --
19 A   I don't even know if he knew that he was
20 presented with a lawsuit back at the time.
21 Q   Well, that's - that's why -- it looks like the
22 complaint was filed in 2012, because it has a case
23 number of 12. So, but you had your conversation with
24 him?
25 A   It could have been January. Whenever our

### 26

1  deposition was the last time.
2  Q   Okay. So it would have been the day after or
3  maybe the same day?
4  A   Right.
5  Q   Okay. And at that time did -- you told him
6  that his name came up on a chart of some sort, right?
7  A   Right.
8  Q   And you told him that -- what did you tell
9  him?
10 A   I basically told him, you're on the radar and
11 if you're smart, you'll stop faxing because they're on
12 to you.
13 Q   All right. And what did he say to you?
14 A   He - he said no problem and he quit.
15 Q   Okay.
16 A   Quit faxing.
17 Q   Did he tell you that you no longer could
18 access his system?
19 A   He told me the last time that I spoke to him
20 that he doesn't have the computer anymore. I asked him
21 what he did with it, he said I don't know.
22 Q   Okay. Well, back in the conversation you had
23 in November or December of 2011 --
24 A   Uh-huh.
25 Q   -- did your relationship with Mr. Prager cease

### 27

1  at that time?
2  A   It did. And I stopped automatic billing.
3  Q   Okay. And what allows you to access his
4  system?
5  A   He's going to have - allowed me in. It's a
6  remote access program system installed.
7  Q   And he has to allow you to --
8  A   He has to allow me -- it has to be enabled and
9  online in order for me to have access to that computer.
10 Q   All right. Do you know if he turned that
11 access off?
12 A   I don't see him on my list anymore, so there
13 is no more account on his computer that I can see.
14 Q   Okay. So, you believe you cannot access his
15 computer?
16 A   I cannot. And first of all, it would have to
17 be on. It's just not even on my account. I have a list
18 of all my computers. His is not on there anymore.
19 Q   Did he do something to --
20 A   He may have uninstalled it.
21 Q   And then at some point you had a conversation
22 with him where he said that he no longer has the
23 computer; is that right?
24 A   Yes.
25 Q   And when did this conversation take place?

### 28

1  A   I would say maybe a month ago. Not exact
2  sure - I'm not exactly sure of the date.
3  Q   How many times have you talked to him from the
4  time that you talked to him in November or December of
5  2011, and the last - and the conversation --
6  A   Just once.
7  Q   All right. So it was a conversation last
8  month; is that right?
9  A   Right.
10 Q   Did you call him or did he call you?
11 A   I called - I called him to let him know about
12 the lawsuit, because I didn't know if he knew it or not.
13 Q   And --
14 A   I told him -- I called him to let him know
15 that I received a deposition for this; that's what I
16 did.
17 Q   All right. So you received a subpoena?
18 A   Right.
19 Q   It looks like it was dated July 10th; would
20 that have been about the time?
21 A   I don't know. I thought this was going on
22 longer than that.
23 Q   Was this the first subpoena that we sent you
24 on this case?
25 A   I don't know.

ROBERT MARTINO                                                  AUGUST 06, 2012
A AVENTURA CHIROPRACTIC vs. MED WASTE

### 29

1   Q   Okay. In any event, you believe about a month
2   ago you had a conversation with Mr. Prager, correct?
3   A   Right.
4   Q   And how long did the conversation last?
5   A   Less than five minutes. Less than three
6   minutes.
7   Q   You told him that you received a subpoena and
8   what else did you tell him?
9   A   I basically - I basically told him, listen,
10  you guys got -- I received a subpoena to testify about
11  your records. And I asked him where his computer was.
12  And he says - he says, I got rid of that a long time
13  ago.
14  Q   Okay. Do you know what he meant by a long
15  time ago?
16  A   No.
17  Q   Okay.
18  A   But I also -- you know, I also kind of, you
19  know, said, you know, that -- I asked him if he had
20  liability insurance. And he told me that -- I can't
21  remember if he told me that he did or he didn't. I
22  think he said he didn't have any.
23  Q   You wrote an email to me or my firm saying
24  that he did have insurance.
25  A   But he wasn't covered or something.

### 30

1   Q   Okay.
2   A   Yeah.
3   Q   So, right. So, did he say he had insurance,
4   that he notified his --
5   A   Oh, yes, you're right. He said that he sent
6   the subpoena to the liability company.
7   Q   Okay. So --
8   A   That's what he did.
9   Q   So, like he would have sent the complaint,
10  correct?
11  A   Right.
12  Q   Okay. So, he sent the complaint to his
13  liability insurance company. Did he tell you which
14  insurance company?
15  A   He did not tell me what company it was.
16  Q   All right. And the insurance company said
17  they're not going to defend this type of case?
18  A   I think that they told him that he was not
19  covered for fax broadcasting or something.
20  Q   Did he ever provide you with any documents
21  relating to any insurance?
22  A   Never.
23  Q   Did he tell you that I had a conversation with
24  him?
25  A   No.

### 31

1   Q   What else did he say to you during that
2   conversation?
3   A   That was about it. I did tell him that he
4   was - that I think he was in default because he did not
5   appear or something for one of those depositions or
6   something. I don't know.
7   Q   Okay. Did you talk to him in the last couple
8   of days?
9   A   I have not.
10  Q   Has he tried to call you or communicate with
11  you?
12  A   No, he has not.
13  Q   So, as you sit here today, you no longer have
14  a business relationship with Mr. Prager?
15  A   I do not.
16  Q   And the last time you had a business
17  relationship with him would have been November or
18  December of 2011?
19  A   Right, which is - you'll see on that flash
20  drive.
21  Q   Okay. And that would be reflected in the
22  credit card statements?
23  A   That's correct.
24  Q   And the credit card statements would include
25  $100 charges?

### 32

1   A   Right.
2   Q   And you believe there is like four or five of
3   those charges?
4   A   Yeah, listed on there. And it's not even a
5   statement. It's just my report, when I go into my
6   credit card merchant account to see how much somebody
7   processed in a certain amount of time. And I went back
8   to the date that I originally signed him up and that's
9   all I came up with.
10  Q   Now, the list that - list -- it's just fax
11  numbers, correct?
12  A   Just fax numbers.
13  Q   All right. And where did you obtain your list
14  of fax numbers?
15  A   I could have obtained them from other
16  customers. Could have, you know, been part of Lenny's
17  list. There is no telling where I could have got them
18  from.
19  Q   All right. And would it be true that you
20  never - you never had any -- strike that.
21      The fax numbers, do you have corresponding
22  company information?
23  A   I do not, not on that list.
24  Q   All right. So, would it be fair to say that
25  you didn't call any of the companies associated - with

ROBERT MARTINO                                                         AUGUST 06, 2012
A AVENTURA CHIROPRACTIC vs. MED WASTE

### 33

1  the associated fax numbers seeking permission for
2  Mr. Prager to send them --
3  A   I did not.
4  Q   -- an advertisement by fax?
5  A   I did not.
6  Q   Did you have any role in creating any of the
7  advertisements for Mr. Prager?
8  A   Abraham did his own advertisements.
9  Q   And attached to the subpoena there is a number
10 (888)431-6386; do you see that?
11 A   Yes.
12 Q   Are you associated in any way with that toll
13 free number?
14 A   I am not associated with that number in any
15 way.
16 Q   To your knowledge, do you believe that's a
17 number that's owned and maintained by Mr. Prager?
18 A   It must be.
19 Q   Do you have an estimate of how many times
20 Mr. Prager sent an advertisement to the fax list on the
21 flash drive?
22 A   I - I really couldn't tell you.  It depends on
23 how many times he rescheduled them to go out again.
24 Q   Well, do you have knowledge as to how many
25 times he sent an advertisement to the fax list?

### 34

1  A   I do not know how many times he sent to that
2  fax list.
3  Q   You believe he sent at least once, correct?
4  A   Yes.
5  Q   And you believe that he - if he sent a second
6  time, he would have used the same fax list?
7  A   Yes.
8  Q   And you believe that Mr. Prager would run the
9  job or -- strike that.
10     You've set up a job - the job for Mr. Prager
11 in the past, correct?
12 A   Yes.
13 Q   How many times did you do that?
14 A   Well, it would depend on if he had -- you
15 know, when he got new numbers, I would probably add the
16 numbers to his system.
17 Q   And he would always run all 60,000?
18 A   Yes.
19 Q   And it would take around 15 days to complete?
20 A   Probably.
21 Q   All right.  Mr. Prager would need to pay for
22 the telephone lines for the sending of the faxes,
23 correct?
24 A   Yes.
25 Q   You would never pay for the telephone lines,

### 35

1  correct?
2  A   I have nothing to do with phone lines.
3  Q   And your other customers, they're also
4  responsible for maintaining their own telephone lines;
5  is that right?
6  A   (Witness nods head affirmatively).
7  Q   Is that a yes?
8  A   I don't know what the other customers have to
9  do with relevancy on this case.
10 Q   Before providing the fax list to me today, did
11 you change, modify, or alter any of the fax numbers?
12 A   No.
13 Q   Did you check to see if A Aventura
14 Chiropractic Center's fax number is on the list?
15 A   I did not, no.
16 Q   Is it in -- it's in electronic form?
17 A   It's in ascii format, which means it's common
18 delimited.
19 Q   Is there a way to find the date, the time
20 stamp from that file?
21 A   I don't know, because I copied it from my
22 computer to the flash drive today.  So, it could have --
23 I do have the original date, though, on my computer --
24 Q   Okay.
25 A   -- and it was back in 2009 or '10.

### 36

1  Q   All right.  So, if the list on the flash drive
2  has a 2012 date, that wouldn't necessarily mean that you
3  changed the content of the fax list, correct?
4  A   That's correct.
5  Q   It would just mean that there is a new date
6  and time stamp because you transferred the information
7  from your computer to the flash drive?
8  A   That's correct.  It - it could have the old
9  date, I don't know.  I didn't look at it.
10 Q   Okay.  The website, nationaldonotfaxlist.org,
11 you run that?
12 A   Yes.
13 Q   And how long have you run that website?
14 A   Couple years.
15 Q   Okay.  Does anyone help you run that website?
16 A   I have a web designer.
17 Q   Okay.  Who is the web designer?
18 A   Mike Thomas.
19 Q   Is that Philip Mike Thomas?
20 A   Yes.
21 Q   And how do you know Philip Michael Thomas?
22 A   I've known him for ten years or more.
23 Q   Does he operate a company?
24 A   I really don't know if he's got a company.  I
25 think he's just himself.

ROBERT MARTINO
A AVENTURA CHIROPRACTIC vs. MED WASTE
AUGUST 06, 2012

### 37

1   Q   And how long have you been working with him?
2   A   Ten years.
3   Q   And does he have experience in fax
4   broadcasting?
5   A   No.
6   Q   Does he have experience in web design?
7   A   Web design, yes.
8   Q   And that's his expertise?
9   A   He's a programmer.
10  Q   And he lives in Port St. Lucie?
11  A   Port St. Lucie.
12      MR. KELLY:  All right.  Let's mark this as
13  Number 2.
14      (Plaintiff's Exhibit 2 was marked for
15  identification.)
16  BY MR. KELLY:
17  Q   I'm going to show you what's been marked as
18  Exhibit 2.  This is also a Med Waste fax.  This one is a
19  little different because it has --
20  A   Right, removed number.
21  Q   Removed --
22  A   Removed website, yes.
23  Q   And just for the record, it's
24  www.nationaldonotfaxlist.org; is that right?
25  A   Yes.

### 38

1   Q   And then there's a medical waste -- what do
2   you call that, directory?
3   A   That's a directory.  Subdirectory.
4   Q   Okay.  Subdirectory.  And were you the person
5   that created the Medical Waste subdirectory, or was
6   it Philip Mike Thomas?
7   A   I did that.
8   Q   Okay.
9   A   Because I set him up with an account, so if
10  anybody were to be removed from his list, it would
11  automatically take it out of the database, out of our
12  numbers.
13  Q   All right.  So let's talk about that then.
14  So, if Mr. Prager would send out Exhibit 2 to the tens
15  of thousands of fax numbers on the list, there would be
16  a few that would want to be taken off the list, correct?
17  A   That's correct.
18  Q   All right.  So the mechanism for the recipient
19  of the - the -- strike that.
20      So, the mechanism of the - for which the
21  recipient would be taken off the list would be that the
22  recipient would go to www.nationaldonotfaxlist.org,
23  right?
24  A   Right.
25  Q   All right.  And then on that website, are

### 39

1   there subdirectories or --
2   A   Well, I -- in his particular case, I set up an
3   account just for him, so it would take the numbers off
4   of his medical list.
5   Q   Okay.  Well, if --
6   A   And that's another reason why I would update
7   his computers with lists.
8   Q   Okay.  So, if I received Exhibit 2, and I just
9   typed in nationaldonotfaxlist.org, would there be
10  somewhere on that website to click on Medical Waste?
11  A   There would have been at that time, but that's
12  not active anymore, because the account has been
13  deleted, his account.
14  Q   Okay.  If I received Exhibit 2, I would click
15  on the national - waste subdirectory --
16  A   No, you wouldn't.  You would just go to -- oh,
17  actually you would have to type in
18  nationaldonotfaxlist.org/medicalwaste, and it would come
19  up with his own page where somebody could enter a fax
20  number and it would remove that fax number off of his
21  list that was on the server.
22  Q   Okay.  And would it -- whose server would that
23  be?
24  A   That's my server.
25  Q   And then, say, I put in my fax number, would

### 40

1   my fax number be automatically deleted?
2   A   From his list, yes.
3   Q   Is there a way to go back to your server to
4   see which fax numbers wanted to be taken off of --
5   A   There -- there --
6   Q   Let me get the question out.
7       Is there a way to go back to your server to
8   determine who wanted to be taken off Mr. Prager's list?
9   A   Once Abraham stopped faxing, I deleted his
10  account.  So, that information would not be available
11  anymore.
12  Q   Okay.  But you still had his list; is that
13  right?
14  A   I had -- that's, the list that you have is the
15  original list.  The real list would have been on - on
16  that account, on the fax site, which is not available.
17  Q   All right.  And you no longer have that,
18  because he's no longer a client of yours, correct?
19  A   Because the account - that account that I had
20  created for him on the national do not fax list has been
21  deleted.
22  Q   Is there any way to recreate that information?
23  A   I would have to ask Mike, and I'm not sure.
24  Q   All right.  What is the purpose of national do
25  not fax list?

ROBERT MARTINO
A AVENTURA CHIROPRACTIC vs. MED WASTE
AUGUST 06, 2012

**41**

1  A  Well, national do not fax list was a pretty
2  good thing until I changed it around, because it allowed
3  anybody to go to that website and take their number off,
4  okay? And we had like thousands of people from Google
5  and the internet that used to go to that site, enter
6  their fax number, and take it off of our master
7  database. Because my philosophy is, I don't want to fax
8  to people that don't want to receive faxes.
9  Q  All right. And you would -- how do you
10 financially benefit from that?
11 A  I don't.
12 Q  And how does Philip Michael Thomas benefit at
13 all financially?
14 A  I paid him to do the programming for the site
15 years ago.
16 Q  Does Philip Michael Thomas, does he currently
17 do work for your company?
18 A  If I need - if I need something done, he does
19 it.
20 Q  Okay. Has he ever been involved in any fax
21 broadcasting?
22 A  He has not.
23 Q  Has he ever sold or rented any fax lists?
24 A  Never.
25 Q  So he's just basically web design?

**42**

1  A  He's a programmer and web designer. And we
2  also have other sites on the server that, you know, he
3  has built and manages.
4  Q  Okay.
5  A  Not fax related either.
6  Q  Does Lenny have access to national do not fax
7  list?
8  A  He does.
9  Q  So, when -- well, let me ask you this: If A
10 Aventura, the plaintiff in this case, didn't want to
11 receive a fax, they could have, if they received
12 Exhibit 2, they could have gone to the website, correct?
13 A  They could have.
14 Q  Okay. Now, if they click on Medical Waste and
15 include their fax number, does that mean that -- that
16 means that the Medical Waste fax list no longer contains
17 A Aventura's fax number?
18 A  That's correct. It also takes it off our main
19 database too.
20 Q  That was my next question.
21 A  Yeah.
22 Q  So any time anybody wants to be removed off of
23 any fax list that you're associated with, it would take
24 it off for every fax?
25 A  That's correct.

**43**

1  Q  And then Lenny would have access to that
2  information; is that right?
3  A  Well, he can - he can actually log in with his
4  own account and download numbers, that's how I have his
5  account set up. But in most cases -- what, are you
6  talking about the remove list?
7  Q  Yeah. When Lenny is selling lists to other
8  people, would it include companies that wanted to be
9  taken off of the list?
10 A  Well, any list that we exchange between each
11 other, if I send him numbers, it's scrubbed against the
12 national do not fax list.
13 Q  In an email to me, July of 2012, you indicate
14 that a list was sold to Mr. Prager that included
15 veterinarians, funeral homes and doctors?
16 A  Yes.
17 Q  And how do you know that?
18 A  That's what the agreement says.
19 Q  All right. So, the national do not fax list
20 website, that was created for all your clients and not
21 just --
22 A  That was created for the whole planet.
23 Q  I know you've said that you don't know what
24 telephone line Mr. Prager was using. Do you have an
25 educated guess, would he be using Comcast or MegaPath?

**44**

1  A  I have no idea.
2  Q  All right. When Mr. Prager was a client of
3  yours back in 2011, the fax list that he was using, you
4  could have accessed that list through your server; is
5  that right?
6  A  Yes.
7  Q  And since he's no longer a client, that was
8  deleted?
9  A  I deleted all the accounts actually, yeah.
10 Q  And the removals for Mr. Prager, would that be
11 on the same server?
12 A  They would be part of the 800,000 list, total
13 - total removals.
14 Q  Was that information included on the same
15 server as the fax list?
16 A  It would be on the same server, yes. But you
17 see, he had his own account. And with the program that
18 I had built, you can create accounts like customer
19 accounts, which would hold their own lists.
20 Q  Is there any way to go back and tell how many
21 times Mr. Prager sent out advertisements by fax?
22 A  I would have to have access to his computer;
23 and then, even then, it would be hard to tell.
24 Q  Right. If he threw out his computer -- you
25 would need his actual computer?

ROBERT MARTINO
A AVENTURA CHIROPRACTIC vs. MED WASTE
AUGUST 06, 2012

**45**

1  A  I would need the actual computer.
2  Q  The header information on Exhibit 2 --
3  A  Uh-huh.
4  Q  -- is that consistent with the header
5  information on ActiveFax?
6  A  Well, it depends on how you do the headers.
7  Q  Well, in this case it looks like - looks like
8  the -- what is that?  Looks like the recipient's fax
9  number is on the header three times.
10  A  Right.
11  Q  That's somewhat unusual, right?  Right?
12  A  I don't know.
13  Q  I mean, generally it has a date on it, right?
14  A  Yeah.
15  Q  Is that the way that you would - that you
16  typically would configure ActiveFax to --
17  A  I would -- I would -- yes, that's the way I
18  would configure that.
19  Q  Why would you configure it with --
20  A  Well, if somebody wants to be removed, a lot
21  of times people will fax them back and say take me off
22  the list, but they don't give you the fax number.
23  Q  Okay.
24  A  Sometimes the pages come in crooked.  So, my
25  customers would always have at least one good number at

**46**

1  the top so that they could know to take that customer
2  off the list.
3  Q  Okay.  So you would -- you're confident that
4  ActiveFax was used to send out Exhibit 2, because of the
5  way the header information is displayed, correct?
6  A  That's correct.
7  Q  And that's consistent with the fax received by
8  the plaintiff in this case, in which the plaintiff's fax
9  number is on there three times, correct?
10  A  That's correct.
11  Q  Did you have any role in answering any phone
12  calls or doing any business for Mr. Prager's medical
13  waste company?
14  A  I did not.
15  Q  Does Kim Rothchild (phonetic) have any
16  involvement in the sending of any of Mr. Prager's faxes?
17  A  He does not.
18  Q  And how do you know Mr. Rothchild?
19  A  That is not relevant to this case.
20  Q  Okay.  To your knowledge, did anyone else have
21  any involvement in the sending of the faxes, other than
22  Mr. Prager, and your involvement in selling the lists?
23  A  I'm not sure.
24  Q  When you would remotely go on to Mr. Prager's
25  system, you would send out the faxes on his behalf,

**47**

1  correct?
2  A  Well, his computer would be sending out the
3  faxes.
4  Q  Okay.  But you would be controlling his
5  computer remotely, correct?
6  A  Well, that would only be if he had updated
7  numbers or a new list but -- you know, again, if he, you
8  know, resends them himself, that's up to him to do.
9  Q  And you never did anything that would be
10  inconsistent with Mr. Prager's instructions, correct?
11  A  Whatever he asked me to do, I would do.
12  MR. KELLY:  Okay.  That's all I have.
13  THE WITNESS:  That's it?
14  MR. KELLY:  So, we can put this on the record.
15  I think I probably told you this before at the
16  prior deposition, but the court reporter has been
17  taking down the questions and answers.  You have a
18  right to review the transcript.  You can't change
19  any of your answers, like a yes to a no, but you
20  might be able to change spellings or words that the
21  court reporter may have gotten wrong; you have that
22  right.  If you - if you want to read it, you can
23  let me know, or you can just trust that the court
24  reporter took down everything accurately.
25  THE WITNESS:  Well, I would like to review it.

**48**

1  And as a matter of fact, the last deposition I
2  never got a copy.
3  MR. KELLY:  Okay.  So, for this case read and
4  sign.
5  MADAM REPORTER:  And what's the address?
6  THE WITNESS:  10097 Cleary Boulevard,
7  Plantation, Florida 33324.
8  (Deposition concluded at 1:50 p.m.)
9  (Reading and signing of the deposition by the
10  witness has been reserved.)

ROBERT MARTINO
A AVENTURA CHIROPRACTIC vs. MED WASTE
AUGUST 06, 2012

---

**49**

1  CERTIFICATE OF REPORTER
2
3
4
5  STATE OF FLORIDA
6  COUNTY OF BROWARD
7
8  　　　I, Cindy M. Whiting, Certified Registered
9  Professional Reporter, certify that I was authorized to
10 and did stenographically report the deposition of ROBERT
11 MARTINO; that a review of the transcript was requested;
12 and that the transcript is a true and complete record of
13 my stenographic notes.
14 　　　I further certify that I am not a relative,
15 employee, attorney, or counsel of any of the parties,
16 nor am I a relative or employee of any of the parties'
17 attorney or counsel connected with the action, nor am I
18 financially interested in the action.
19 　　　Dated this 10th day of August, 2012.
20
21
22
23 　　　　　　Cindy M. Whiting, CSR, RPR
24
25

---

**50**

1  CERTIFICATE
2
3  STATE OF FLORIDA
4  COUNTY OF BROWARD
5
6  　　　Before me, this day, personally appeared
7  ROBERT MARTINO who, being duly sworn, states that the
8  foregoing transcript of his deposition, taken in the
9  Matter, on the date and at the time and place set out on
10 the title page hereof, constitutes a true and accurate
11 transcript of said deposition.
12 　　　　_____
13 　　　SUBSCRIBED and SWORN to before me this _____
14 day of _____, 20___ in the Jurisdiction
15 aforesaid.
16
17 　　　_____   _____
18 　　　My Commission Expires    Notary Public
19
20 *If no changes need to be made on the following two
21 pages, place a check here _____, and return only this
22 signed page.*
23
24
25

---

**51**

1  DEPOSITION ERRATA SHEET
2
3
4  Our Assignment No. 305708
5  Case Caption: A AVENTURA CHIROPRACTIC CENTER,
6  INC.
7  vs. MED WASTE MANAGEMENT LLC and JOHN DOES 1-10
8
9  DECLARATION UNDER PENALTY OF PERJURY
10 　　　I declare under penalty of perjury
11 that I have read the entire transcript of
12 my Deposition taken in the captioned matter
13 or the same has been read to me, and
14 the same is true and accurate, save and
15 except for changes and/or corrections, if
16 any, as indicated by me on the DEPOSITION
17 ERRATA SHEET hereof, with the understanding
18 that I offer these changes as if still under
19 oath.
20 　　　Signed on the _____ day of
21 _____, 20___.
22
23 _____
24 ROBERT MARTINO
25

---

**52**

1  DEPOSITION ERRATA SHEET
2  Page No._____Line No._____Change to:_____
3  _____
4  Reason for change:_____
5  Page No._____Line No._____Change to:_____
6  _____
7  Reason for change:_____
8  Page No._____Line No._____Change to:_____
9  _____
10 Reason for change:_____
11 Page No._____Line No._____Change to:_____
12 _____
13 Reason for change:_____
14 Page No._____Line No._____Change to:_____
15 _____
16 Reason for change:_____
17 Page No._____Line No._____Change to:_____
18 _____
19 Reason for change:_____
20 Page No._____Line No._____Change to:_____
21 _____
22 Reason for change:_____
23
24 SIGNATURE:_____DATE:_____
25 　　　ROBERT MARTINO

ROBERT MARTINO  
A AVENTURA CHIROPRACTIC vs. MED WASTE  
AUGUST 06, 2012

53

1        DEPOSITION ERRATA SHEET
2        Page No._____Line No._____Change to:_____
3        _____
4        Reason for change:_____
5        Page No._____Line No._____Change to:_____
6        _____
7        Reason for change:_____
8        Page No._____Line No._____Change to:_____
9        _____
10       Reason for change:_____
11       Page No._____Line No._____Change to:_____
12       _____
13       Reason for change:_____
14       Page No._____Line No._____Change to:_____
15       _____
16       Reason for change:_____
17       Page No._____Line No._____Change to:_____
18       _____
19       Reason for change:_____
20       Page No._____Line No._____Change to:_____
21       _____
22       Reason for change:_____
23
24       SIGNATURE:_____DATE:_____
25            ROBERT MARTINO